**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CASEY LAMB, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CV-03592 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| County of Lake, | ) | |
| Lake County Sheriff's Office, | ) | Magistrate Judge Sheila M. |
| Armor Correctional Health Services | ) | Finnegan |
| Inc., Sheriff John D Idleburg, | ) | |
| Sergeant John Hall, Unit Officer Wallace, | ) | |
| Chief of Corrections William Thornton, | ) | |
| Unknown Lake County Adult Corrections | ) | |
| Facility Medical Director, | ) | |
| Dr. Alvaro Encinas, and | ) | |
| Mellody Standiford, LPN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The day after Casey Lamb's arrest in June 2019, he was taken to the hospital for medical treatment and diagnosed with hepatitis C and related liver disease. R. 12, First Am. Compl. (FAC) ¶¶ 26, 29.[1] He was soon discharged from the hospital and sent back to the Lake County Correctional Center, where he remained as a pretrial detainee for a little over six months. *Id.* ¶ 2. During that time, Lamb alleges that he was denied necessary testing and treatment for hepatitis C. *Id.* ¶¶ 31–68. Based on the allegedly inadequate medical care, Lamb brings this lawsuit for violations of his right to due process under the Fourteenth Amendment, 42 U.S.C. § 1983, against the

---

[1]Citations to the record are noted as "R." followed by the docket number.

medical service providers who provided (or failed to provide) his medical care, and against Lake County, the Lake County Sheriff's Office, Lake County Sheriff John Idleburg, and Lake County Jail staff members Chief of Corrections William Thornton, Sergeant John Hall, and Unit Officer Wallace.[2] FAC.[3]

The Lake County Defendants—Sheriff Idleburg, his office, Thornton, Hall, Wallace, and the County itself—now move to dismiss all the claims filed against them. R. 21, Mot. to Dismiss. For the reasons explained in this opinion, the motion to dismiss is granted in part and denied in part.

## I. Background

In considering the motion to dismiss, Lamb's factual allegations must be accepted as true, and reasonable inferences made in his favor. *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). Casey Lamb was arrested on June 21, 2019, for non-violent property offenses. FAC ¶ 22. As he was being arrested, Lamb asked to be taken to the hospital, showing the arresting officers that Lamb had open and infected wounds on his hands. *Id.* ¶ 23. Both the arresting officers and the nurse who examined Lamb at the Lake County Correctional Facility (Defendant Mellody Standiford) refused to send Lamb to the hospital. *Id.* ¶¶ 23–24. During Lamb's arraignment later that day, a state court judge saw the wounds and ordered the government

---

[2]The first name of the Defendant sued as "Unit Officer Wallace" does not appear in the First Amended Complaint or elsewhere in the record, as far as the Court can tell. FAC ¶ 17.

[3]This Court has jurisdiction over this case under 28 U.S.C. § 1331.

2

to take Lamb to the hospital. *Id.* ¶ 25. The next day, Lamb was admitted to Vista East Hospital in Waukegan. *Id.* ¶ 26.

Vista Hospital staff treated Lamb's wounds and, because of his history of intravenous drug use, conducted blood tests to check for hepatitis C. FAC ¶¶ 26–28. The tests revealed that Lamb indeed was infected with hepatitis C, and had transaminitis—that is, "high levels of certain liver enzymes in the blood stream"—which is a symptom of hepatitis C and liver disease. *Id.* ¶ 29. According to the First Amended Complaint, citing a healthline.com article, "[t]ransaminitis can lead to serious liver damage and even liver failure if left untreated." *Id.* Vista Hospital staff noted the test results in Lamb's medical records and suggested that he needed "further evaluation and treatment" for his transaminitis. *Id.* ¶ 30; R. 12-1, Pl.'s Exh. A, Vista Records at 3.

After a few days in the hospital, Lamb was sent back to the Jail on June 26. FAC ¶ 31. The Jail is managed and operated by the Lake County Sheriff's Office, which Lamb labels an "agency" of Lake County. *Id.* ¶ 13. The Sheriff (during all relevant times for this case) was John Idleburg, who in that role was "responsible for establishing and implementing the policies and practices at the Jail, and for ensuring that the policies and practices comply with federal and state requirements for the treatment of detainees." *Id.* ¶ 15. Health care services at the Jail were provided by Armor Correctional Health Services, a private firm contracted to be "responsible for providing adequate medical and correctional care to detainees held at the Jail, training and supervising jail medical and correctional personnel, and ensuring that the

3

policies and practices at the Jail comply with federal and state requirements for the treatment of detainees." *Id.* ¶ 14.

The day after he returned to the Jail, Lamb met with Dr. Alvaro Encinas, a physician employed by Armor and a named Defendant in this case. FAC ¶¶ 20, 32.[4] Lamb told Dr. Encinas about his hepatitis C diagnosis and asked for treatment. *Id.* Dr. Encinas told Lamb that his hepatitis C could be cured with anti-viral drugs "in as little as eight to twelve weeks." *Id.* ¶ 32. But Encinas told Lamb that he (Encinas) had to order tests to verify the hepatitis C infection before he could prescribe those drugs. *Id.* In Lamb's medical chart, Encinas noted that he had examined Lamb and had reviewed the records from Vista Hospital and noted that Lamb had transaminitis, but the doctor did not otherwise explicitly mention hepatitis C. *Id.* ¶¶ 32–33; R. 12-2, Pl.'s Exh. B, Chart Notes at 235. Nor did Dr. Encinas promptly order the additional blood tests that he had told Lamb were necessary. FAC ¶ 34.

Instead, Lamb recounts a frustrating three months of repeatedly requesting blood tests and treatment, but being ignored by the Jail's medical staff. FAC ¶¶ 35–39. Lamb explains that he "made several written and oral requests to Armor nurses, both requesting to see Dr. Encinas again and for treatment." *Id.* ¶ 35. He alleges that Dr. Encinas, as well as the Unknown Medical Director of the Jail and Nurse Standiford, all knew about his requests for hepatitis C treatment but ignored them. *Id.* ¶ 36.

---

[4]Dr. Encinas's first name appears as "Aivaro" in various places across the record, likely due to the understandable misreading of the original, handwritten complaint. "Alvaro" appears to be the correct spelling. *See* R. 1, Compl. at 3; R. 15, Appearance of Counsel for Alvaro Encinas M.D.

On July 4, 2019, Encinas noted in Lamb's chart that he was "cleared to reenter general population after completing antibiotic regimen" for the hand wounds he had when he was arrested. *Id.* ¶ 37; Chart Notes at 235. Lamb was transferred to the general population that day without having received any treatment for hepatitis C, despite the fact that hepatitis C is an infectious disease. FAC ¶ 37. Finally, on September 14, Encinas noted in Lamb's chart that Lamb "requests that he would like to have HIV and hepatitis testing done, was told in the hospital that he had 'hepatitis C', never was treated." *Id.* ¶ 38; Chart Notes at 254. The next day, Encinas ordered the blood tests (which he had first told Encinas he would order back on June 26). FAC ¶ 39.

But actually successfully performing the blood tests proved challenging. Nurse Standiford was unable to draw blood from Lamb's arms because of the "poor condition" of his veins. FAC ¶ 40. The veins on Lamb's feet were more accessible than the ones on his arms, but Standiford neither tried to draw blood there, nor asked for permission to do so. *Id.* Instead, she recommended that Lamb be sent outside the Jail for the blood draw. *Id.* Based on that recommendation, on October 8, Lamb was taken to a laboratory called LabCorp in nearby Gurnee. *Id.* ¶ 41. But the LabCorp technicians also could not draw blood from Lamb's arms, and Dr. Encinas's order had not authorized them to draw from the accessible veins on Lamb's feet. *Id.* ¶ 42. Three days later, Lamb was taken back to LabCorp and the technicians successfully drew blood from his feet. *Id.* ¶ 43. That same day, October 11, LabCorp sent to the Jail the test results, showing that Lamb indeed had hepatitis C. *Id.* ¶¶ 44–45. The test results included

this statement in bold: "The CDC recommends that a positive HCV antibody result be followed up with a HCV Nucleic Acid Amplification test." *Id.* ¶ 46, R. 12-3, Pl.'s Exh. C, Lab Test Results at 1.

Even after receiving—and allegedly reviewing—these LabCorp results, the medical staff at the Jail still did not further evaluate or treat Lamb for hepatitis C. FAC ¶ 47. On November 10, 2019, Lamb submitted another written request to the nursing staff, asking for follow-up with Dr. Encinas and treatment for his hepatitis C. *Id.* ¶ 48; R. 12-4, Pl.'s Exh. D, Health Care Services Requests at 1. Eight days later he submitted a similar request. FAC ¶ 49; Health Care Services Requests at 2. Four days after that, he submitted a third written request. FAC ¶ 50; Health Care Services Requests at 2. Lamb alleges, on information and belief, that Dr. Encinas, Nurse Standiford, and the Jail's Unknown Medical Director all knew about these requests but ignored them. FAC ¶¶ 51–52. On November 26, Lamb spoke to Nurse Standiford and asked again to see Dr. Encinas for his hepatitis C treatment, only to be told that the doctor had not been at the Jail much lately and had not had time to see Lamb. *Id.* ¶ 54. Nurse Standiford told Lamb to submit a written request to see the Nurse Practitioner, which Lamb promptly did, but he was never scheduled to see the Nurse Practitioner. *Id.* ¶¶ 54–55.

Finally, on December 6, 2019, Lamb met with Dr. Encinas again. FAC ¶ 56. Lamb reminded Encinas of his hepatitis C diagnosis and of the need for treatment by anti-viral drugs. *Id.* ¶ 57. But instead of prescribing the drugs, the doctor allegedly dropped a bombshell: "Dr. Encinas then informed Mr. Lamb that he couldn't and

6

wouldn't prescribe him such anti-viral drugs because he had spoken to his superiors at Armor and was told that Armor and Lake County's policies forbid the drugs due to their high costs." *Id.* ¶ 58. Encinas told Lamb that the doctor had only ever prescribed the drugs to one patient at the Jail, and that patient had been suffering from "end stage liver failure." *Id.* Not only did Encinas not prescribe the anti-viral drugs, he provided no further testing, treatment, medication, or education of any kind related to Lamb's hepatitis C. *Id.* ¶ 59. A few weeks after this meeting with Dr. Encinas, Lamb submitted one last request for treatment to Armor, asking that Armor and Lake County reconsider their policy banning the anti-viral drugs. *Id.* ¶ 60; Health Care Services Requests at 4. He received no response to this complaint. FAC ¶ 61.

Having gotten nowhere with the Jail's medical staff, Lamb submitted a grievance to the Lake County Sheriff's Office on December 28, 2019. FAC ¶ 62; R. 12-5, Pl.'s Exh. E, Grievance. The grievance set out in detail Lamb's experience at the Jail. FAC ¶ 62. Lamb asked the Sheriff's Office to "intervene on my behalf with medical and help me get hep c treatment, and to change Lake County and Armor's No Hep C treatment policies." *Id.* ¶ 63; Grievance at 1–2. On January 7, 2020, Lamb's grievance was returned to him. FAC ¶ 64. He alleges that "Sgt. Hall hand-delivered a copy of Mr. Lamb's grievance to Officer Wallace, who in turn returned the grievance to Mr. Lamb." *Id.* But instead of a substantive response, Lamb received a handwritten, unsigned, pink-colored post-it note; it was dated 12/30, affixed to the grievance, stating, "This is not a medical request, it is a for [sic] grievances. Fill out a Medical Form." *Id.* ¶ 64; Grievance at 1.

Lamb immediately appealed the denial of the grievance to Chief Correctional Officer Thornton. FAC ¶ 66. More than two weeks later, on January 24, 2020, Thornton denied the appeal in writing, with this explanation: "I can find no written policy to collaborate [sic] your allegation. In fact, it's the direct opposite of what you stated. I also spoke with representatives of armor [sic] and discovered that a treatment plan was in place for you." *Id.* ¶ 67; Grievance at 4. Lamb received no further treatment or evaluation for hepatitis C while at the Jail. FAC ¶¶ 3–6.

In January 2020, after pleading guilty to the state charges, Lamb was transferred to the custody of the Illinois Department of Corrections, where he remains today. FAC ¶¶ 10, 69–70. There, he has received further testing and treatment for hepatitis C. *Id.* ¶ 71–74. Testing in April 2020 revealed that Lamb's "hepatitis C infection had advanced to 'stage 3 fibrosis,' a term used to describe *severe scarring* extending across different parts of the liver and the surrounding areas." *Id.* ¶ 72 (emphasis in original). Stage 3 fibrosis is the last stage before cirrhosis, which is liver damage so severe that it is usually irreversible. *Id.*

Lamb filed this lawsuit *pro se* in June 2020. R. 1, Complaint. Counsel later filed appearances on his behalf, and the lawyers filed a First Amended Complaint. R. 12, FAC. In addition to the allegations discussed earlier, Lamb targets government officials and entities, alleging, "On information and belief, Sheriff Idleburg established and implemented the policy or practice of denying evaluation, treatment, and medication to detainees suffering from hepatitis C." FAC ¶ 15. Lamb also sues Hall, Wallace, and Thornton on a failure-to-intervene theory, *id.* ¶¶ 80–83, and the Lake

8

County Sheriff's Office and Lake County on a *Monell* theory of liability. *Id.* ¶¶ 84–90. The County, the Sheriff's Office, Idleburg, Thornton, Hall, and Wallace now move to dismiss the claims against them. Mot. to Dismiss.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. See Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Inadequate Care (Sheriff Idleburg / Count 1)

Count 1 of Lamb's complaint is a Section 1983 claim for denial of medical care in violation of the Due Process Clause of the Fourteenth Amendment, specifically against Sheriff Idleburg, the Unknown Medical Director, Dr. Encinas, and Nurse Standiford. FAC ¶¶ 75–79. The pending motion challenges this claim only as to Sheriff Idleburg. Mot. to Dismiss at 7–8. Section 1983 provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights ... secured by the Constitution ... shall be liable to the party injured." 42 U.S.C. § 1983. Government officials can be sued in their official capacity (which then really is a claim against the government *entity*), their individual capacity (which is a claim against the official *personally*), or both. Lamb originally alleged this claim against Idleburg in both his individual and his official capacity. FAC ¶ 15. In his response brief, Lamb clarifies that he wishes to proceed against Idleburg in only his individual capacity. R. 26, Pl.'s Br. at 8, n.1. Idleburg argues that the claim should be dismissed because there are no allegations that he was personally involved in the alleged deprivations of Lamb's rights. Mot. to Dismiss at 7–8.

10

"To establish *personal* liability in a Section 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991) (cleaned up) (emphasis in original). Here, the right at issue is medical care: pretrial detainees have a right to receive adequate medical care under the Fourteenth Amendment's Due Process clause. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). To state a claim for denial of medical care against Idleburg, Lamb must allege that Idleburg was personally involved in his care (or lack of care). *Kuhn v. Goodlow,* 678 F.3d 552, 555–56 (7th Cir. 2012). Lamb alleges that Idleburg was a final policymaker for Lake County and that in that role, under color of state law, he personally "established and implemented" the policy of denying hepatitis C treatment to inmates. FAC ¶ 15.[6] If Idleburg ordered that no inmates (or virtually no inmates) receive treatment for hepatitis C, then his order directly prevented Lamb from receiving the treatment—and thus directly deprived him of his constitutional rights. *See, e.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation" (cleaned up)); *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998) ("[I]f the supervisor personally devised a deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act"). At the pleading stage, the

---

[6]Idleburg is more properly considered a final policy maker for the Lake County *Sheriff's Office*, which he leads, rather than the County itself. This opinion discusses this mix-up as to Lake County versus the Lake County Sheriff's Office at greater length below.

Court must accept as true this allegation of Idleburg's direct, personal involvement in banning hepatitis C treatment. Maybe discovery will refute the allegation, but with its truth assumed, Lamb adequately has asserted Idleburg's personal involvement under § 1983.

Against this, the defense argues that Lamb actually has advanced a *Monell* claim against the Sheriff's Office based on Idleburg's alleged ban on treatment, so there is no individual-capacity claim to be had against Idleburg. But the defense cites no case law to that effect. If a final policymaker creates an unconstitutional policy that the official's agency then enforces, and that policy directly causes the deprivation of the plaintiff's rights, then there is no reason why the plaintiff cannot pursue *both* an individual-capacity claim and a *Monell* claim against the municipality. To illustrate the point: if a County Sheriff were to decree a new policy forbidding any Jail detainee from receiving any medical care whatsoever, then a detainee harmed by the lack of medical care could sue the Sheriff individually and, separately, the municipality (that is, the Sheriff's Office) under *Monell*. In contrast, if a detainee only alleged that a Jail enforced a long-existing policy of inadequate medical care—without the Sheriff's express knowledge or affirmation of the policy—then an individual claim would likely *not* be viable against the Sheriff, because the Sheriff had no personal involvement in violating the detainee's right to medical care.

The defense also argues that Lamb has not adequately alleged that there was a policy against treating hepatitis C, premising the argument on the fact that Dr. Encinas told Lamb that one previous detainee *did* receive the treatment. Mot. to

Dismiss at 8. Remember that Dr. Encinas allegedly told Lamb that no anti-viral drugs would be prescribed because "Armor and Lake County's policies forbid the [antiviral] drugs due to their high costs." FAC ¶ 58. To the defense's way of thinking, if one detainee received treatment for hepatitis C, this fatally disproves Lamb's allegation that there is a broader policy of denying treatment. Mot. To Dismiss at 8. This argument borders on the frivolous. Lamb alleged that the physician employed by Armor to work at the Jail explicitly told him that Armor had a policy of *not prescribing* antiviral medication to treat hepatitis C, and that the sole exception was for a detainee who was in end-stage liver failure—in other words, for a dying man. FAC ¶ 58. This one-off exception for a gravely ill detainee does not undermine the broader allegation that Armor otherwise banned antiviral medication to treat hepatitis C. At this stage in the proceedings, the allegation that Dr. Encinas told Lamb that there was a policy against prescribing anti-viral drugs for hepatitis C is sufficient to support Lamb's claim that that policy existed.

Beyond that allegation, which likely would be enough on its own, Lamb's own experiences point to a broader policy. It is true that one plaintiff's personal experience is often not enough from which to infer a broader policy (though here Lamb outright alleges that Idleburg himself set the policy). But here there are facets of Lamb's personal experience that actually support the broader inference. After Lamb tested positive for hepatitis C at the hospital, and the hospital sent records of that test to the Jail, it took Dr. Encinas nearly three months to even order the necessary follow-up tests. FAC ¶¶ 29–39. Then it took another three weeks to get Lamb's blood tested to

13

confirm the hepatitis C. *Id.* ¶¶ 39–45. After his diagnosis was confirmed, and despite Lamb's repeated requests for treatment, Lamb was still not treated, medicated, or educated on how to manage his serious illness. *Id.* ¶¶ 46–59. According to the First Amended Complaint, the facts of which must be taken as true at the dismissal stage, Lamb was repeatedly denied testing and treatment by the medical contractors at the Jail.

From this individual experience with Armor staff, Lamb then goes further and alleges that Jail officials got in on the act. Taking all his allegations as true and drawing reasonable inferences in his favor, Lamb has alleged that the Jail's guards and staff essentially slow-walked the grievance that he filed with the Sheriff when his medical requests went unanswered. Lamb's grievance specifically requested intervention with the medical unit and changes to the Jail's policies about hepatitis C treatment. FAC ¶¶ 62–63. He submitted this grievance on December 28, 2019, but did not receive a response until over one week later, on January 7, 2020. *Id.* ¶¶ 62–64. Instead of engaging with the substance of the grievance, an unknown staff member simply responded via a handwritten post-it note, directing Lamb to fill out a medical form—which he had been doing all along to no avail. *Id.* ¶ 64. (Although the note was dated December 30, Lamb asserts that the Jail did not give it to him until January 7. *Id.* ¶ 64.) Lamb appealed that grievance on January 7 and waited more than two weeks to receive a response. *Id.* ¶¶ 66–67. When Lamb finally did receive a substantive response, it was a denial from Chief Thornton, who said that the alleged policy did not exist, and that Lamb had a treatment plan in place. *Id.* ¶ 67. The

14

defense argues that this response shows that Lamb responded adequately to Lamb's grievance. R. 32, Defs.' Reply at 5–6. But again, at this stage in the proceedings, Lamb's allegations must be taken as true. Lamb alleges that there *was* a policy denying treatment to hepatitis C treatments, and that he did *not* have a treatment plan in place for hepatitis C. This means that on *Lamb's* version of the facts, Chief Thornton's response reveals either an inadequate investigation into the situation, or a willful attempt to cover up the reality. Chief Thornton, like the medical staff, did nothing to help Lamb receive treatment for his hepatitis C. FAC ¶ 68. And as the Chief of Corrections, Thornton worked for the Lake County Sheriff's Office, which was led by Sheriff Idleburg. A reasonable inference is that Thornton carried out the policies and practices set by the Sheriff.[7]

To be clear, Idleburg cannot be held liable for the acts of his employees. "There is no such thing as *respondeat superior* liability for government officials under § 1983." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). But the allegations against a swath of Sheriff's Office employees—including the Chief of Corrections—and their participation in denying Lamb medical care can supply an inference, combined with the other allegations described earlier, that Idleburg set a policy of denying treatment to pretrial detainees with hepatitis C.

---

[7]Lamb also cites the Jail staff's early reluctance to take him to the hospital for treatment of his wounded hands as further evidence of the policy against treating inmates for hepatitis C. FAC ¶¶ 24–25; Pl's. Br. at 4–5. But this is a stretch. Nobody knew about Lamb's hepatitis C at that point in time, and Lamb's medical-care claim challenges the lack of treatment for hepatitis C specifically.

In sum, the individual-capacity medical-care claim against Sheriff Idleburg survives the motion to dismiss.

## B. *Monell* Claim (Count 3)

Moving on to municipal liability, Lake County and the Lake County Sheriff's Office seek dismissal of Lamb's *Monell* claims against them. As it turns out, the First Amended Complaint supports this claim against the Sheriff's Office, but not against Lake County.

In Count 3, Lamb sues both Lake County and the Lake County Sheriff's Office. Municipalities, like individuals, are suable "persons" under § 1983, as the Supreme Court held in *Monell v. New York City Department of Social Services. Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 403 (1997) ("We held in *Monell* ... that municipalities and other local governmental bodies are "persons" within the meaning of § 1983.") (citing *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694 (1978)). To adequately state a *Monell* claim—that is, to allege that a municipality caused a deprivation of the plaintiff's constitutional rights—the plaintiff must allege "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau,* 506 F.3d 509, 514 (7th Cir.2007) (cleaned up). That requires, practically speaking, three things.

First, the plaintiff must allege that he or she has suffered the deprivation of a constitutional right. *See* 42 U.S.C. § 1983. Second, the plaintiff must adequately allege that the municipality's "policy or custom" at issue in fact exists. *Estate of Sims,*

16

506 F.3d at 514. There are three ways to do this: a plaintiff can allege "an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or … the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012). Finally, the plaintiff must allege causation, that is, the plaintiff must connect the policy or custom to the constitutional deprivation by alleging that the former was the "moving force" behind the latter. *Estate of Sims,* 506 F.3d at 514.

Here, Lamb brings *Monell* claims against Lake County and the Lake County Sheriff's Office (as well as Armor, but Armor did not move to dismiss). FAC ¶¶ 84–91.[8] Lamb explains that he wishes to proceed under the second and third theories of *Monell* liability, namely, that the Defendants have a widespread practice amounting to a policy of denying treatment to inmates with hepatitis C, and that Sheriff Idleburg, a final policymaker, gave the order to deny treatment to hepatitis C sufferers. Pl.'s Br. at 12. As already discussed, Lamb has sufficiently pleaded the existence of a policy that barred pretrial detainees from receiving treatment for hepatitis C. He concedes that "the policy at issue was likely unwritten," which suggests that the policy or practice exists, for now, in a gray area between the first and second theories of

---

[8]Lamb says he is dropping his claim against Sheriff Idleburg in his official capacity, though that claim is interchangeable with his claim against the Sheriff's Office. *See Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir. 2008) ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself.") (citing *Hafer v. Melo,* 502 U.S. 21, 25 (1991)).

*Monell* liability; discovery will probably clarify the specific theory of liability. For now, the question is whether Lamb has adequately stated a claim against Lake County or the Lake County Sheriff's Office (or both) based on this policy or practice.

On review of the allegations, Lamb has pleaded enough facts to support the *Monell* claim against the Lake County Sheriff's Office, but not Lake County. As already discussed in detail, Lamb alleges that Sheriff Idleburg, the elected leader of the Lake County Sheriff's Office, "established and implemented the policy or practice of denying evaluation, treatment, and medication to detainees suffering from hepatitis C." FAC ¶ 15. It is true that Lamb hedges on this allegation by making it "on information and belief," *id.*, but at the pleading stage it is appropriate to do so here because he does support it with other well-pleaded facts, as discussed earlier.

Lamb has also linked the alleged policy to his own deprivation of rights. He alleges that as a result of the policy, he never received treatment for hepatitis C while in custody at the Jail. FAC ¶ 3–6. And he alleges that, when he finally did receive further testing and treatment (after being transferred to the custody of the Illinois Department of Corrections), he learned that his hepatitis C had reached an advanced stage, nearly past treatment. *Id.* ¶ 72. Lamb has thus sufficiently alleged that the policy caused the deprivation of his constitutional right to medical care.

What Lamb has not quite done, however, is adequately state a *Monell* claim against the County of Lake. In Illinois, every county is a separate municipal entity from that particular county's Sheriff's Office. *See, e.g., Carver v. Sheriff of LaSalle County, Ill.*, 243 F.3d 379, 382 (7th Cir. 2001); *Franklin v. Zaruba*, 150 F.3d 682, 686

(7th Cir. 1998). The County certainly belongs in the case as an indemnifier for the Sheriff's Office and its employees (that is Count 8, for state law indemnification). But Lamb has not alleged that specific government actors employed by Lake County were involved in policymaking on hepatitis C treatment (or lack of it) for the Jail. He does not allege that the County Administrator or a member of the County Board dictated or even greenlighted the alleged policy at issue. Absent allegations against Lake County, no *Monell* claim has been adequately alleged the County.

Perhaps discovery will turn up the missing link, and if that happens, Lamb can ask for leave to again amend the complaint to add the County back in. For now, however, the *Monell* claim in Count 3 is dismissed without prejudice as to Lake County. It survives against the Lake County Sheriff's Office.

### C. Failure to Intervene against Hall, Wallace, and Thornton (Count 2)

Finally, Lamb brings a failure-to-intervene claim against Thornton, Hall and Wallace. FAC ¶¶ 80–83. Lamb alleges that each of these defendants knew that he was being denied hepatitis C treatment, and realistically could have intervened on his behalf to prevent the violation of his rights, but failed to do so. *Id* ¶ 81. The Defendants disagree and seek dismissal of the claim. Mot. to Dismiss at 5.

Nonmedical correctional officers can be held liable for their failure to intervene in medical issues in only limited circumstances. As a baseline assumption, "jail officials ordinarily are entitled to defer to the judgment of medical professionals." *Rice ex rel. Rice*, 675 F.3d at 676. But this deference has limits, particularly when the

19

medical need is plain: "jail officials may not turn a blind eye to an inmate in distress or to obvious incompetence on the part of the physicians and nurses treating its inmates." *Id.* More specifically, nonmedical officials can be held liable if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011) (cleaned up). Generally speaking, if a detainee alleges that he alerted correctional staff to his plight through a letter or complaint, then he must allege that his letter "gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (cleaned up).

The correct standard for pretrial detainees' medical-care claims under the Fourteenth Amendment is that of objective unreasonableness. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). The "deliberate indifference" standard cited by the Defendants is for *convicted* prisoners bringing claims under the Eighth Amendment, which prohibits "cruel and unusual punishments," or as the Supreme Court has interpreted it, the "unnecessary and wanton infliction of pain." *Id.* at 350 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). But pretrial detainees are not in the same boat as convicted prisoners serving their sentences. Because pretrial detainees "have not been convicted of anything, … they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them." *Id.* The distinction between convicted prisoners and presumed-innocent pretrial detainees was highlighted relatively recently by the Supreme Court. In *Kingsley v.*

20

*Hendrickson*, the Supreme Court held that the correct standard to apply to the claims of pretrial detainees for excessive force under the Due Process Clause of the Fourteenth Amendment was whether the force used was objectively unreasonable. 576 U.S. 389, 396–97 (2015). Three years later, the Seventh Circuit concluded that the Supreme Court's reasoning also applied to pretrial detainees' medical-care claims. *Miranda*, 900 F.3d at 351–52. Applied here to Lamb's failure-to-intervene, Lamb must plausibly plead that the "defendants acted purposefully, knowingly, or perhaps even recklessly" in failing to intervene, and also that their actions were "objectively unreasonable." *Id.* at 353. Negligence alone still does not suffice under the Due Process Clause. *Id.*

Here, Lamb has alleged enough facts for the failure-to-intervene claim against Chief of Corrections William Thornton to survive. As a reminder, Thornton was the correctional officer who answered Lamb's appeal of the denied grievance complaining about the lack of medical treatment. FAC ¶ 67. That grievance explained that Lamb had been diagnosed with hepatitis C, a serious disease, and was not receiving treatment—this is enough to put Thornton on notice that Lamb faced an "excessive risk to [his] health or safety." FAC ¶ 62; *Vance*, 97 F.3d at 993. In Thornton's written response to the grievance, Thornton purported to have investigated the complaint, found no policy against treating patients with hepatitis C, and found that Lamb did have a treatment plan in place. FAC ¶ 67. But again, those are not the facts that Lamb alleges, and it bears repeating that Lamb's well-pleaded facts must be taken as true, for now. So, on the alleged facts, Thornton's investigation was recklessly

inadequate because it turned up only wrong information—or, alternatively, he did discover the truth but his response to Lamb was untruthful. Thornton had an opportunity to conduct a thorough investigation and intervene on Lamb's behalf, and on Lamb's version of the facts, he failed to do so. Because Thornton apparently read the grievance, his failure to intervene can be considered knowing and purposeful. And assuming that Lamb was not receiving vital medical care, and that the Jail's policy was to deny him that care, it was objectively unreasonable for Thornton not to intervene.

Lamb's allegations against Hall and Wallace, however, are much thinner. In total, all that Lamb says is that on "January 7, 2020, Sgt. Hall hand-delivered a copy of Mr. Lamb's grievance to Officer Wallace, who in turn returned the grievance to Mr. Lamb. Attached to the first page of the grievance was a pink post-it note" which has already been described. FAC ¶ 64. Based solely on this interaction, Lamb goes on to allege that Hall and Wallace knew he was being denied treatment and could have intervened on his behalf. *Id.* ¶ 65. But the facts do not support this inference. Lamb does not allege that either Hall or Wallace authored the pink post-it note, or even read the note or his grievance. He alleges, as the defense puts it, "one transactional contact" with these Defendants. Mot. to Dismiss at 9. That is not enough to state a claim for failure to intervene.

Hall and Wallace are therefore dismissed from this case, though without prejudice for now. If Lamb believes that he can amend his complaint to state facts that

connect these Defendants to the case, then he can seek permission to do so. Count 2 survives, however, against Chief Thornton.

### D. Indemnification (Count 8)

Because Claims 2 and 3 survive against Thornton and the Lake County Sheriff's Office, respectively, Lake County must remain in the case as indemnifier in case these Defendants are found liable.

### IV. Conclusion

The motion to dismiss is granted in part and denied in part. The inadequate-medical care claim (Count 1) may proceed against Sheriff Idleburg in his individual capacity; the failure-to-intervene claim (Count 2) may proceed against Chief Thornton; and the *Monell* claim (Count 3) against the Lake County Sheriff's Office survives as well. The indemnification claim (Count 8) remains in the case against Lake County. But the failure-to-intervene claims (Count 2) against Wallace and Hall are dismissed, as is the *Monell* claim against Lake County (Count 3), both without prejudice.

ENTERED:

_s/Edmond E. Chang_
Honorable Edmond E. Chang
United States District Judge

DATE: September 22, 2021

23